THE LODGE "KNIGHTS OF AGUEYNABA," No. 9639, ETC., Plaintiff and Appellee, *v.* THE LODGE "KNIGHTS OF PYTHIAS," ETC., Defendant and Appellant.

No. 6318. Argued April 17, 1934.—Decided September 29, 1934.

*Enrique Báez García* for appellant. *Pascasio Fajardo Martínez* for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the Court.

The plaintiff lodge was organized in the year 1916 in the city of Mayagüez, under the auspices of the "Grand United Order of Oddfellows in America." It was named Lodge "Knights of Agueynaba, No. 9639."

On August 5, 1922, the lodge purchased from Antonio Touzón a concrete one-story house located on Peral Street, Mayagüez, and the purchase was recorded in the registry of property. The lodge moved in, and as the house was too small for its meetings and activities, it was enlarged by building a second story.

On May 9, 1930, the plaintiff appears in a public deed selling its house to the defendant, and this is an action brought by the former to annul the deed, or rather, the contract embodied therein.

The defendant demurred and answered. The case went to trial and the court rendered judgment for the plaintiff, with costs. The defendant then took the present appeal, assigning in its brief the following errors which it claims were committed by the district court: (1) in overruling its

demurrer; (2) in deciding that the notary before whom the deed was executed was incapacitated; (3) in holding that there was identity of contracting parties; (4) in holding that there was no consideration; (5) in sustaining the complaint, and (6) in mulcting it in costs.

In its statement of the case and opinion the trial court held as proved the existence of the plaintiff lodge since 1916, its acquisition of the house in question, and the enlargement thereof, and its devotion to a temple.

It also held as proved that the sale of the house to the defendant was not a real and effective sale but one made in order to prevent the house from being mortgaged and in order that the defendant lodge, constituted by the same members of the plaintiff lodge, could engage in activities prohibited by the regulations of the plaintiff lodge; and that once the defendant obtained the execution of the deed, it rebelled against the United Order of Oddfellows in America and abandoned the plaintiff lodge expelling those members who remained faithful to the Order, and appropriating the temple to its own use and benefit, and constituting a new order named Latin Oddfellows of America.

The above facts established, the court reached the following conclusions:

"That the members which constituted the plaintiff lodge prior to the authorization to form the defendant lodge and to the authorization to sell the described property belonging to the defendant, were the same members or persons . . . and that all of them knew that the deed of sale in question was executed *pro-forma,* with the only purpose of preventing the property in question from being encumbered and to perpetuate the life of the defendant and its premises.

"That the rebellion of a great number of the members of the plaintiff lodge after they became members of the defendant lodge was made with the preconceived idea of dispossessing the plaintiff from its property . . . as it clearly appears from the fact that . . . they rebeled and abandoned the plaintiff, entirely excluding the latter and its members from their rights to said property, notwithstanding the fact that they knew that the defendant lodge had been

organized for the sole purpose of teaching and enlightening all members of the plaintiff lodge, since the rules and regulations of the same allowed no other reading, lectures or teachings but those related with said plaintiff order.

"This Court also holds. . . .

"That there was no consideration whatsoever for the sale, as said obligations (the one thousand shares to bearer of $5.00 each) do not appear to have been executed in favor of the seller . . . When the plaintiff entity sold the property it was the only person, as such, which should have received the value or consideration of the sale, but not its members or unknown persons. The sale with promissory notes in favor of unkown persons which at maturity might be holders and lawful bearers of the same, is equivalent to the non-payment of the price, which is contrary to the power "to sell" given by the plaintiff to its officers.

"This Court also finds that the deed in question is null by the other ground that the same persons which originally formed the plaintiff lodge later constituted the defendant lodge, and as the plaintiff lodge was the seller and the defendant lodge was the purchaser in law both parties were the same, that is, there are no relations between two parties, one the seller and the other the purchaser. It is not conceivable in law that one person be at the same time purchaser and seller.

"This Court finally concludes that the said deed was null on the other ground that the notary before whom it was executed was unable to act as such a notary in the execution of said deed; inasmuch as it clearly appears from the evidence that he was an interested party. . . . ."

To get a clear view of the facts and of the attendant circumstances, it seems advisable to copy the following from the deed dated May 9, 1930, and from the testimony of witness Altieri.

The deed reads as follows:

"By this deed the Lodge "Knights of Agueynaba" No. 9639 of the Grand United Order of Oddfellows in America, represented by its Worthy Noble Grandee (President), the said Juan Acevedo Pérez, sells the property described, with all its belongings to the said Worshipful Lodge, Knights of Pythias, for FIVE THOUSAND DOLLARS, which the said purchaser by its Knight Commander (President) Elpidio Rivera delivers in this act in ONE THOUSAND PROMISSORY NOTES TO

BEARER, to be paid without interest on the tenth day of May of the year one thousand nine hundred fifty; and to secure the payment of all the one thousand promissory notes to the bearer which it delivers, to the natural or artificial person which on the said date of maturity might be the holder of all and each one of the said PROMISSORY NOTES to bearer, and for the interests at 10 per cent annual rate from the date of maturity to its total payment, the purchaser, the Worshipful Lodge Knights of Pythias, represented by its Knight Commander, Elpidio Rivera, constitutes voluntary mortgage upon the same urban property purchased by this document.''

And the witness testified in part:

''Q.—Are you in any way related to the Lodge Knights of Agueynaba No. 6369?

''A.—Yes, sir; I was its founder in Mayagüez 16 years ago.

''Q.—For what purposes was said lodge organized?

''A.—It was organized for the purposes determined by fraternity among the brothers; mutual insurance and visits to sick brothers; we organized an insurance fund, and any other disposition coming from the Grand District Lodge and from the London Biennal Committee.'

''Q.—That is, it has no lucrative purposes?

''A.—No, sir.

''Q.—On or about the year 1930, did you have anything to do with the members of that lodge?

''A.—I did.

''Q.—Please tell the Court about your intervention therein.

''A.—In the year 1930, in my capacity as Patriarch of said Order, and in order to prevent any violation to the principles thereof —the sessions must end at 10:000 o'clock in the evening, they can never go beyond that hour—I was informed by the clerk of this Honorable Court, in my capacity as Patriarch, that the sessions were being held up to 12:00 and 1:00 o'clock in the morning.

''Attorney Báez García—I object.

''The Court.—Yes.

''Witness—All right. Then I was informed by the brothers that it was impossible to work and I stated that it was due to lack of schooling, that I was going to think about the possibility of forming another institution within the same lodge, so that our friends Arnaldo and Mr. Calor Motta would go to lecture them on Sundays; I was then summoned by then to receive my advices. When I got there I was

given the mallet to preside the session, and then I told them that it was necessary to organize a lodge which we would call 'Knights of Pythias,' to be devoted to instruction, since that can not be done in the Order; and to some brothers who suspected that the lodge was going to be sold I said: 'Well, I will make a *pro-forma* deed among yourselves, as you are at the same time the Knights of Pythias and the Knights of Agueynaba, you will pay in a thousand shares of $5.00 each, one for each brother, and each time a new candidate is initiated, he will pay the initiation fees, and besides one of those shares so as to be a co-owner of the building.' The ythen met, agreed to do that, and I made the deed.

"Q.—This deed which I show you, is it the one to which you refer?

"A.—Yes, sir, that is the same deed. They met in open session and I went to the lodge and there I read the deed and told them: 'This is the deed, do you all agree?' and every one consented, and that night they signed it before me."

Of all the errors assigned we think that the only one which exists is the second. To our judgment notary Altieri was not unable to act. However, the error is not sufficient to cause the reversal of the judgment, because the judgment is sustained by its other grounds.

To do justice in this case it is necessary to consider it as a whole. When we considered each assignment of error included in the brief for the appellant, we have sometimes believed that it is absolutely right, but in considering together all the facts and the attendant circumstances, such belief disappears and the conclusion reached by the trial court finally prevails.

The appellant strongly insists that this is a case in which the courts should leave the parties in the same situation because they are in *pari delicto*, citing judicial precedents to that effect. And it must be admitted that the contention has some merit.

Usually it does not pay to be dishonest. Misrepresentations as a rule engender difficulties and troubles. And that is what happened here. The advise give by Altieri was not

a wise one, and the ones who followed it were not right in doing so. They were deceitful and they have been involved in troubles and difficulties. But the facts themselves show that their purpose was not fraudulent. They tried to cover more than what the rules of their order authorized and to keep their property free forever, and they have been in danger of losing it, and the results of the violation were more far reaching than what they expected. They have suffered the consequences of their own acts, but those consequences should not go as far as if they had conspired to commit a crime. Hence they could invoke, as they did invoke, and obtain the protection of the courts in order to reestablish the truth, and to restore the *status quo*.

We also think that the appellant is right when it argues that the same persons can organize different corporations with powers to contract among them, and in maintaining that the promissory notes to the bearer which it was agreed to give as price might have some value, but considering together all the facts, precedents and circumstances, as shown by the evidence weighed as a whole, the conclusion that there was no real and effective contract of purchase and sale imposses itself, the deed having been executed *pro forma,* as said by Altieri, so that the same persons could engage in their own temple in certain activities which they desired and which were prohibited by the rules that they were bound to obey.

Otherwise it is unexplicable that the price was fixed the way it was. No money in cash was delivered. Promissory notes maturing in 20 years without paying interest during that period and with the only security of the house sold was the only thing delivered.

Assuming that the plaintiff, once it received the notes, offered them for sale in the market, what could it obtain for them? It is not possible to believe that it could get five dollars, not even one, since the buyer would have given the money to get it back after 20 years receiving no benefit whatsoever during that time and with the risk of the security

being destroyed by fire, hurricane, cyclone or any other calamity, or that it would depreciate by the course of time in such a manner as to be of little or no value when he was to exercise his right to recover. It must be considered also that the house was assessed in five thousand dollars, and the total of the bonds amounts to that same sum.

Under these circumstances, though it can not be positively affirmed that the bonds are absolutely valueless, we think that it may be stated that as a matter of fact they have no value and that therefore, there was no consideration in the transaction.

As to the costs it must be concluded that they are the logical consequence of the facts proven.

The appeal must be dismissed and the judgment appealed from affirmed.